Simple set of facts. Investment advisors who were controlling insiders under Section 16 and required to avoid short-swing trading engaged in short-swing trading as managers of their client accounts. Although there is an exemption provided for investment advisors who manage client accounts, the exemption specifically applies only to passive investment advisors who do not trade their accounts for the purpose or with the effect of controlling a company. These investment advisors filed 13-D reports as required, announcing their control purpose and acknowledged that their trading of these securities in these managed accounts was not exempt. In this situation, the profits realized in the client accounts should be disgorged. There are three reasons for this. First, the advisors and their clients were members of a 13-D group. The clients were in a group of their advisors because their investment management agreements gave the advisors complete discretionary trading authority over their accounts. So any time the investment advisor got close to 10 percent, then everybody every client then is part of a group by virtue of an open-ended, broad investment agreement? Not at all, Your Honor, only if there was a control purpose. So in the normal course, when there's no control purpose, an advisor simply The control purpose is only going to be on the part of the investment advisor. Is there anything in the complaint to suggest that the clients had some control purpose in mind? No. There's nothing in the complaint that suggests that, and we're not alleging that. The advisors had the control purpose, but as in other cases this Court has ruled on, even if the advisor has the control purpose and the people who give the authority to the advisor just trust the advisor's judgment, this Court has held back in Wellman v. Dickinson that that's sufficient to constitute a group. So in that case, you had several shareholders all giving their authority to an investment advisor. That's an issuer-specific situation, right? Well, that was an issuer-specific situation, but again, there are other cases in which the motives of the parties for entering the agreement was related to an entirely different issuer, and that still constituted a group. And there are also situations where the Court has emphasized that the agreement does not have to be specific to a particular transaction, for example, the transaction that triggers the reporting, or it doesn't have to be specific to a particular control purpose that the advisor has. I still am not entirely sure how you avoid the thrust of the statutory language that talks about securities of an issuer. Yes. How do you seem to me that you have that? Right. So that was the focus of the District Court's opinions, the securities of an issuer. So respectfully, I would suggest that the way that they narrowly construed that phrase is contrary to the ---- What do you think it means? So I think what that means is that when an agreement covers a threshold amount of securities, then a issuer-specific 13d is filed. I mean, 13d is always related specifically to one issuer. So when the group reporting is triggered under 13d, which in these cases both defendants concede that it was triggered, even though the agreement was not issuer-specific, both of these defendants included the client accounts on their 13ds anyway because of their general agreement. And once that 13d was filed, it's our view that all of the securities on that 13d are subject to short-term trading restrictions unless there is an exemption. I don't see how your theory of the operation of this statute functions in the context of a manager of a discretionary account. So in the normal course, again, the discretionary accounts would be exempt, even if the manager has more than 10 percent. If the manager's purpose is passive, which the rule providing the exemption contemplates that in the ordinary course of business, an investment advisor's purpose would be passive and would not be trying to take over a company. When the investor announced – when the advisor, I'm sorry, announces that the accounts are being managed with the purpose of taking over the – of taking over a company, then those securities in the accounts are then included as part of the control group. So that's a tacit agreement, is what you're saying, between the investors and the investment  No, what I'm arguing is that the – But that's the language of the rule, right? When two or more persons agree to act together for the purpose of acquiring securities of an issuer, the group is formed. Right. So the agreement in my – in our position is the agreement is the investment management agreement, and normally it's exempt until a control purpose is announced. But wait. So you're saying the – again, so then you're saying there was an agreement even before they settled on an issuer. That's correct. There was agreement when you gave discretionary investment authority. That – there is an agreement, but – There's an agreement to do what? To invest and trade their securities that are in the client's account together. But they have to agree to act – I'm sorry. Go ahead. No, you. An agreement to act for what purpose? An agreement to act for the purpose of – Doesn't there have to be a common goal for – in order for various entities to be considered a group? Right. So there is a common goal, which is the common goal is to trade and vote and or vote all of the securities in the client's account for the benefit of them both. If the investments in the client's account improve, both the advisor and the client are happy. They each have a unity of interest because one acts as the agent for the other. But to the Court's concern and the district court's concerns, in most cases, that agreement, the discretionary trading agreement to an investment advisor, won't cause any Section 16 issues or Section 13 issues because that will be exempt because in the ordinary course, an investment advisor acts in a passive capacity. What the exemption provides is that when an investment advisor not only is an advisor but is also an actual insider, not just a 10 percent owner, but a controlling insider, then the advisor is subject to the statutory restrictions on short-swing trading because that statute applies when there is a risk that the advisor will access the presumptive inside information that they have and use it to trade securities, including securities in the client accounts. There is no reason that an investment advisor who is not supposed to trade client accounts in violation of the statute should be able to do it as long as they don't make a profit because the profit is the only way that the statutory restriction is enforced. Well, look, that sounds like a great policy argument, but we're having trouble getting past the language of the rule, and so is the SEC interpreting it this way? So they're interpreting it the an issuer rule, which is a 13-D rule. So, again, that rule, even though it says an issuer. Well, it says agree to act for the purpose of acquiring the securities of an issuer. Sure. I think it's acquiring, voting, or disposing. Well, yeah, but. But, yeah, an issuer. So every issuer in the client's account is covered by their investment management agreement, right? The voting and trading of any issuer in that account is the advisor has the right to vote and trade those securities because of the investment management agreement. Again, normally that's exempt. There's no issues. When the advisor adopts a control purpose, as I was saying, even in this case, these advisors say that 13-D was triggered when they adopted a control purpose because that 13-D rule requires them to file the 13-D with respect to this issuer, even though the agreement is just discretionary. Look, if I'm an account holder and I have this account manager, and I've never had a discussion any time about any subject, can I still become, under your scenario, a member of the group? So if you give your. . . If so, how would that come about? So if you give your discretion to an advisor, let's say Fidelity or something like that, and normally they have no control purpose. I mean, normally advisors, the rule is correct that in the ordinary course, an investment advisor typically does not engage in takeover efforts. I'm sitting in Sun Valley in my apartment home playing golf and watching television. I don't talk to them. I don't have any dealings with them. I don't have them pass any purchases or sales through me. It's entirely passive. Under your theory, I can wake up one morning and find myself a member of a group. Well, okay, so two things about that. One, the 13-D is what, in our view, triggers the group for Section 16 purposes. So there is public disclosure of the fact that they are a manager of a group, which includes client accounts. Once that disclosure is filed. . . There's no evidence that they knew about that, right? Right. So they don't know about it. So first of all, under the securities laws, you can't say you didn't know about something that was publicly disclosed. I mean, that's like a tenant. . . I'm sitting out in my retirement condo, and I've got to be perusing the SEC's website to find out who's filing 13-Ds? Not at all. So in our view, there's nothing that requires the client to monitor the securities filings of the advisor, anything like that. The advisor who created this problem for the client by adopting a control purpose that was non-exempt with respect to managing the client's account can comply with the statute and should comply with the statute for the client. But I may have to give back short-swing profits as a consequence of being in a group. I had no idea existed. I didn't know what a group was. That's exactly what you're asking. Right. I mean, so it's the — even though the profits come from the client because of strict  because the discouragement remedy is only about the illicit profits that were earned in that period. There's no loss to the client. So the reason indemnification is precluded and why you might think, oh, it's unfair if the client's liable and can't even, like, blame the advisor and get the advisor to indemnify them is because there's nothing to indemnify the client for. The client has no loss. The client's just not able to make the short-swing profit because the advisor should So the advisor's account, there's no, like, if the advisor's account starts with a $50 balance, there's still $50 in the account after the profits are discouraged. There's just not $52. There's not the $2 profit that was made during those six months. So the client doesn't even have to know about it. He's not going to look at a statement and say, what's this crazy bill for? There's not going to be anything like that because they'll just see that there's no gain. I mean, they won't see anything. They're — Mr. Tamra, you reserved two minutes for rebuttal. Yes. There's one out here from Mr. Tracy, is it? Yes.  Good morning, Your Honors. Dennis Tracy for the Apolles. And I think the key to this case is the question of whether an unaffiliated managed account, as Your Honor said, who may be completely unconnected and, in this case, is completely unconnected to the investment advisor, has no idea of what the investment advisor is doing, can become part of a group and subject to the draconian remedies of Section 16B by entering into a generic investment advisory agreement. If you had all these facts here but, in addition, there's an allegation in the complaint that Client A had a conversation with the investment advisor where they discussed the investment advisor's interest in controlling the issuer, that would be different? If they're aware of it. If they're aware of it. It's not just a generic agreement. They're aware. They have a conversation about the investment strategies of the investment advisor. So if they were aware of and agreed to a control purpose with regard to a specific issuer and that were alleged in the complaint, that would raise a plausible inference of joining a group. Under Section 13D5B1, the complaint has to state a fact that raised a plausible inference that two or more persons agreed to act together in connection with an issuer. And if so, each of the members of that group are then deemed to beneficially own the securities of, quote, that issuer. So the rule is clearly phrased in terms of a specific issuer. And in this case, there is no allegation that there was any agreement, written or oral, with respect to DeVry. There's no allegation that there was even a communication between the managed account, which is unaffiliated with IVA, and IVA that related in any way to DeVry. And there's no allegation that the managed account was even aware that there were purchases of DeVry stock in his or her account or that there was any control purpose with regard to DeVry. And the courts that have reviewed situations like this have consistently held that the mere fact that a customer, an unaffiliated customer, entered into an investment agreement with an investment advisor, which didn't relate to any issuer, does not thereby become part of a group. And the reason for that is clear. It is inconsistent with the words of the statute and the rule implementing it. It would create a hugely expanded scope of liability under Section 16B. And as we've said in our brief, the Supreme Court has cautioned that the terms of Section 16B should be implemented literally according to their terms, and the courts should be reluctant to expand the scope of that liability because it is a no-fault draconian remedy. And in this case, there is no allegation that the managed account became part of a group and no basis for finding that he or she did become part of a group. And on that basis, there is no basis for liability. Mr. Taub makes arguments that I characterize as policy arguments that this is sort of a loophole. This would allow investment advisors to trade on inside information with no consequences. What's the response to that? My response to that is that the Congress and the SEC have stated what the rule is, and if the Congress and the SEC view this as a loophole, they can change the statute or the SEC can change the regulation. But to date, the Congress and the SEC have stated that unless you agree to act together on a common objective, you cannot be part of a group. I suppose it wouldn't absolve you from criminal prosecution for insider trading if that's what was going on, right? Absolutely, Your Honor. We're just talking about disgorgement. We're just talking about disgorgement. It's a statutory remedy that applies in strictly defined circumstances, and it doesn't apply here. All right. Thank you, Mr. Chief. Thank you, Your Honor. Now Mr. Hyland. Mr. Hyland. May it please the Court, Mark Hyland for the Birch defendants. Your Honor, you raised the hypothetical of a manager having a conversation with a customer about a particular security and whether that is a fact that could bring this into the realm of the managed account being in a group. I would say that is not a close question. It would not be. It would not be. The agreements at hand here are managed account agreements separately negotiated with each managed account member where discretion is given entirely to the investment advisor. So in that hypothetical, which we don't have here anyway, I just want to be clear, the law would be no, you need much more than that. You would need an actual agreement by each group member really to work towards a common purpose control, for example, with respect to a particular issuer. So I think you need a lot more. And I think the Cicelli case, of course, Your Honor, is very familiar with that. And I think that would be closer to a group theory being recognized than the case we have here, than the case we have here. I don't think this is even close. In my case, the Birch defendants are independent, separately negotiated managed accounts. The investment advisor is not even defendant in the case. The investment advisor was dismissed out of this case. And there is no allegation whatsoever that there was any sort of active activity on the part of the managed accounts solely by reason of the investment agreement, the managed account agreement. The argument is that they became group members when the investment advisor identified a possible control purpose. Getting there, I think that it's clear that there's no support in the rule for that. But I do want to address the newly advanced agency theory. The plaintiff has raised that appeal. Well, there's an agency theory. What you're doing here is you're ceding to an agent authority to act on your behalf, and therefore you should become part of a group. A common law agency theory in no way can trump an actual rule promulgated by the SEC, the industry's primary regulator. And that rule says, if that rule was, well, you have to be as an agent, it would say so. That rule says, no, you have to have an agreement to pursue a common objective of a particular issuer. And the cases say particular issuer. And that is the law. No, and Your Honor, to your question on whether or not this would create a loophole for 10b-5, indeed it wouldn't. An investment advisor is always subject to Rule 10b-5 violations, civil or criminal. What the evil of the Section 16. There's no suggestion of that here. Right, of course not, of course not. The evil that the rule is designed to address is make sure that an investment advisor discloses when he's got 10 percent or more than 10 percent that he has voting power over, that investment advisor has to file a 13b and disclose that. Okay? So now the evil has been eradicated. There's disclosure. This person's out there. He's made the disclosure. And now he could become, you know, sort of a target, right? That's the purpose of it. 10b-5 still applies. But because he files or she files a Section 13d stating I have voting power of more than 10 percent, that goes to the investment advisor's issue, not the group. You need an agreement by the group. And keep in mind, we're not dealing with a fund here. That presents a much more thorny issue. Some of those other cases have an investment advisor who is a general partner of a limited partnership where the limited partners are the investors. There you're dealing with one entity, one single entity, so you're trading your own securities. That's a much closer question. That's not before this Court. Before this Court is whether or not you've got a group where you've got passive investors out there. As Judge Parker, I thought, very persuasively noted in his hypothetical, who could well be retirees sitting on the beach subject to this type of disgorgement liability, which could be pretty draconian. That's not the purpose of the rule, and if it was, the SEC would be all over it. They'd be all over it, and they've never taken that position. In terms of policy, does this give a loophole? It doesn't give a loophole. Section 16 is a, quote, blunt instrument. It is applied without any intent. It is strict liability, and in cases like this, a mechanical, literal reading of the rule is required. I respectfully submit you cannot read a policy argument into a rule that's promulgated under those circumstances. All right. Thank you, Mr. Highland. Ms. Talbot, we'll now hear from you for two minutes. Your Honor, my adversaries aren't mentioning the fact that their investment advisor exemption specifically exempts securities only on these conditions, and so the fact that the investment advisor exists, in my view, shows that without the investment advisor, all of the investment advisor securities that are traded by the advisor would be subject to the statute. And generally, for policy reasons, when an insider is subject to Section 16, that applies to all the shares traded by the insider for the simple reason, again, that an insider shouldn't be able to do for other people what the insider can't do for himself. So if the insider is trading other people's shares, those people are also insiders, and that's how the Section 16 rule incorporates group principles in the first place to make sure that when an insider is working together with others, that the others are not excluded from disgorgement, that it's not just a narrow focus on the insider's specific pecuniary interest, but there's two criteria of beneficial ownership that are taken into consideration, which is are you sharing investment control and voting control? And in this case, the clients are sharing investment and voting control with their advisor by agreement. That's what creates the group. And then if so, every person sharing voting and investment control is independently required to disgorge their pecuniary interest in the profits. And that's how the sort of broad – they're calling it a blunt instrument, but the policy is that even without insider knowledge, even without showing that you have insider information or that you did something wrong, just for the purpose of keeping the markets honest, insiders who have presumptive events that are accessed, which the clients have through the managers acting as their agents, shouldn't be trading in a short-swing period at all. Under your hypothetical, wouldn't they be subject to insider trader liability? You mean 10b-5 liability with the clients? Both 10b-5 and, as you described, when they're insider traders. Yeah. I mean, I think that the equivalent in 10b-5 context, if the clients – let's say the advisors. So under your theory, the woman sitting in her – the man sitting in his vacation home could get indicted. Well, if – I mean, I think it's not that insane when you think about, for example, Martha Stewart or some case like this where you have somebody who tells somebody. In this case, there's no need to tell anybody because the agent has – You're imputing all this liability – I mean, this knowledge to people who – I'm not imputing knowledge. I'm imputing access through the agent. So the agent has – neither the advisor nor the client have to have actual knowledge. That's the whole point of Section 16, like actual insider knowledge. They just have to have insider access. The advisor has access because, statutorily, they're a 10% owner. They also, as they disclosed, are actively engaged in discussions with the board. One of these advisors has an actual board appointee. They have insider access unequivocally. And if they're trading their client's securities, those clients are imputed with the insider access because they're benefiting from it to the same extent as the advisor. So in full circle, under your theory, I can become a member of the group by doing absolutely nothing. That's correct, but you also don't have to do anything to avoid liability. All that has to happen is that your advisor has to know that they're an insider with actual control. They don't trade their managed accounts in a short-swing period. And if this court makes that rule clear, they won't do it anymore, and this won't be an issue because it's very easy to comply with the short-swing trading rule. You put blackout periods on the stock, and when you buy, you don't sell for six months. When you sell, you don't buy for six months. It's not complicated. It's not like you can risk. It's really the simplest rule there is, which is the whole point of the statute. And in terms of the penalty, again, it's non-punitive. So if it is violated, all that's disgorged is the illicit profits that shouldn't have been realized in the first place. All right. Thank you. Okay. Thank you, Ms. Taber. Thank you all. Interesting and well-argued.